Good morning, Your Honor. First of all, in this case, I do not believe there is substantial evidence of anticipation. There are three references where there were verdicts of anticipation. The first is Clark. It appears on page A-7-505 of the appendix. The reference clearly does not have the required elastic chestband claims. Mr. Krasinski admitted as much. The only testimony there was was some general testimony that if there happens to be a chestband in a particular product, it will be elastic. Vera has the elastic chestband. The only difference from Vera is that the chestband also connects with the outer fabric. Vera is shown on page 2040 of the appendix. Vera is not anticipatory for another reason, and that is that the outer fabric, which is indicated to be three, it does attach to the inner nursing flap, but it clearly does not encircle the torso as the outer fabric is required. Where does the claim require that the outer fabric encircle the torso? That's in the jury instruction in the court's claim construction, Your Honor. There's jury instructions with the Markman order to find a fabric body only as one or more pieces of fabric joined together. And that definition of the meaning of the patent doesn't have anything to do with encircling the torso. Well, Your Honor, the parties agreed on the jury instruction, and the jury instruction was based upon a joint statement that wasn't ruled upon by the court, but was embodied on page 886 of the appendix that's attached to our brief. This was the court's jury instruction. It claims one, five, and 12 fabric body means one or more pieces of fabric joined together encircling the wearer's torso to form an outer garment. That's how the court instructed the jury based upon the parties' agreement. Again, the jury made the findings here. So why would we construe three in Vera to be the same layer that is connected to four in Vera that does encircle the torso? Because there's no evidence. There's no substantial evidence that it does. It's simply the outer portion that is brought up. And it clearly doesn't encircle the torso. No, Mrs. Johnson did not state that it did, and no other witness said that it did. And the reference clearly shows that it does not encircle the torso. Well, number four on Vera, looking at the figure there, does encircle the torso, does it not? That is not our fabric. Why isn't it the same fabric as the fabric that makes up three, the outer layer of the breast cup there, only with the elastic wrapping around all of it? Right, but it's a separate piece of fabric, and this outer fabric has to attach to the inner nursing flap as well, and that elastic that goes around. But it could be one or more pieces of fabric joined together. That's all it has to be. If they're joined together, they don't even have to be the same piece of fabric. So three and four can be different fabrics if they're joined together. But it was three that was identified as the outer fabric body, not the other things to which it's attached. And the same exact statement is true with respect to the J.C. Penny brawl. Mr. Brzezinski admitted that what he called the stretch fabric body was differentiated, was a separate thing, and was differentiated from what went around the back. And that's an admission. We quoted that in our reply brief, that there's no encirclement of the torso by the J.C. Penny brawl either. So I think this jury instruction has to be taken into account. And Ms. Johnson testified about Vera. But there was no testimony that this outer fabric, she talked about the outer fabric being three, and it clearly does not encircle the torso. By the way, did the court adopt the jury instruction as its claim construction? Your Honor, this— What is the claim construction? Well, the claim construction— That we are dealing with— Well, I believe it did. The Markman hearing, of course, was much earlier than the trial. And the parties had really agreed to this claim construction about encircling the torso. And it didn't come into the court's Markman ruling. There was a joint claim construction. And you didn't object to that, right? Pardon me? Did you object to the court's Markman ruling— I was not— —climbing the torso encircling element, which I don't find in the claim itself either. No. But, Your Honor, the court didn't rule on it. Well, the parties had a joint claim construction where they both agreed on encircling the torso. So the judge did not rule on that particular element. Only ruled on— Where in the claim does it say encircling the torso? It doesn't, does it? The specification is very clear. If you read the claim, you'll find the specification. But the parties—my point here, Your Honor, the parties agreed on this terminology as a joint claim construction statement. And they later agreed to incorporate this into the jury instructions along with the other claim constructions. So the parties agreed on that. We'll check with you in a minute. Well, as in, you know, the instruction is there, and it has that language. It's interesting. It's not often we have a claim construction that differs from a jury instruction. And both parties seem to rely on both. Well, the only reason for that is that there was no dispute at the bargaining hearing about this encircling the torso. It was in the parties' joint claim construction statement. The court was not required to rule on it. At the time the jury instructions were presented to the court, this jury instruction was there. Now, for that reason, I'm going to return to the actual conduct next. We don't think that J.C. Petty brought us material because it's not in anticipation. It doesn't have any teaching that it should be changed to make it into this tank-top type product. And moreover, Mr. Jacobson had a very reasonable explanation. He did not think it was material. He didn't even see that it was a two-fly bra cup. He thought it was cumulative. The other side's expert, Mr. Brzezinski, agreed that it was cumulative. And he gave a very rational explanation for why he didn't think it was necessary to disclose it. And under the Starr Scientific case, in that circumstance, I clearly don't think there's any intent to deceive. Judge Brown, in his opinion, talked about Mr. Jacobson's lack of experience. Well, lack of experience does not indicate intent to deceive, perhaps negligence. And he says that he should have consulted an expert. Again, there's no evidence of intent to deceive. Now, the other inequitable content is based upon this claim of prior mention, where Mr. Jacobson was only given a naked claim that sometime before 2002 something was made, but there was no documentary corroboration. There was no corroboration that Mr. Jacobson was given whatsoever. It was simply a naked claim. And in that case, I do not think that is material information. All it is is a naked claim that can't be checked out as to whether it's a prior art or not. And under the case law, I do not think that can be material information. By the way, he did disclose it. I mean, he didn't hide it from the patent office. He was trying to get his patent allowed, and he mentioned that this claim was made. So he did nothing to reveal an intent to deceive there. And when you really get to the 102G question of the prior mention, there isn't any corroboration, any contemporaneous corroboration with documents or photographs or anything, like a lab book that refers to the claim elements. Let me ask you about that, and I take your point as to the early documents that described a council, a nursing council that had a number associated with it. It doesn't show very much by way of detail. But the one document that struck me as interesting was the patent application that was Johnstone. And as the district court pointed out, Fig. 13 of that application was, at least according to Johnstone, a figure that was drawn based on an actual physical example, or a physical drawing at least, of the 460 at a time before the fire, at a time when those things existed. Why isn't that as good as, say, a photograph? A photograph, we wouldn't know whether the photograph was taken yesterday or taken in 1998, but we would have a physical piece of evidence, and then we could debate that. Well, the patent application was filed quite late and referred to the Rothman tank top. It did.  You remember the portion in the district court's opinion in which he says, that figure was drawn by apparently the patent attorney, or I suppose the draft attorney, based on an actual disclosure of the underlying design. At a time when it was quite the underlying design still existed. But I believe, Your Honor, that at the time that application was filed, the Rothman's website had already been looked at by Ms. Johnstone. They had already seen the patented product. Well, I understand. I understand. But you still do have, if she had brought in the actual, suppose she had brought in an actual sewn version, but she didn't have a date stamp, but she had the sewn version, you could still say, well, she must have made that last night. But it would still be corroborative, wouldn't it? No, Your Honor, it's not contemporaneous. This invention supposedly was made in 1998, years before. If it's a corroboration, you're asking for proof positive of anticipation. Corroboration doesn't require that all the elements of anticipation be satisfied, right? No, but, Your Honor, here this application was filed after they had seen the Rothman invention, after they had discussed the possibility of licensing. But the reason that that's pertinent is because you're saying, well, she's not telling the truth. It's after the fact. The fact says that this design was not, was, was, was, well, 1998. But let me finish my question. This is, for me at least, it's an important element. What that figure gives us, however, seems to me is different from the oral testimony that you object to from others, in that it gives specificity as to what is at least claimed to be the 460 design. Yes, Your Honor. I don't think so, and this is the reason. They also gave these witnesses. They would show them the infringing product, the accused infringing product, and they would show it to them in, you know, 2002 and say, okay, isn't the invention, the prior invention, Miss Johnson, wasn't it just like this? And that's the same thing as this patent application. After they see our invention, after they've been involved in licensing negotiation, they look at it on the website. They say it's a good idea. It looks very interesting. Then they come in after the fact. And, you know, that is, that can't be corroborated. The corroboration has to occur before the other competitive inventor comes along. That's from the interference practice. The corroboration can't be after you see the other side's invention and its prior invention. Well, okay. I understand. So, again, with respect to the, you know, I don't think there's any possibility of intent to deceive here. Mr. Jenkins did refer to this prior invention claim in terms of the patent office. He thought it was an outrageous claim. He just didn't believe it, and he had a rational explanation. And the fact that he's inexperienced, the fact that he didn't consult an expert, those are all things that may suggest negligence, maybe even gross negligence. But an intent to deceive has to be shown very strongly. And the Starr Scientific case— Aren't these credibility type of determinations something we uniquely leave to our juries? Well, Your Honor, I think the Starr Scientific case says before you get to this credibility issue, there has to be really some evidence of intent to deceive. And the Starr Scientific case is very emphatic, and it dealt with that exact issue. And if you don't get to these credibility issues, there's some evidence. And the only evidence the judge cites is he's inexperienced and he didn't consult an expert. That's not evidence of intent to deceive. You can't just infer it from the reference. And one of the references is not anticipatory. It doesn't say anything about obviousness. And the other really isn't prior art according to the strict standards of corroboration. Otherwise, anybody—if someone gets accused of infringement, they can take their infringement product and say, Oh, didn't someone make this two years ago, five years ago? Let's get our customers together. And maybe they're not blind, but their recollections, without any corroboration, I think there's a policy against doing that. Because every patent infringement case will turn into that scenario. I wanted to say—I'm glad to continue, but my time is running a little short. I wanted to say a couple of words about obviousness. Obviousness was their burden of proof. Now, they put it on two witnesses that had addressed it in some way. Ms. Johnston addressed it. She thought the patent application was obvious. She thought the idea was so great. She thought the patent offer was novel and not obvious. That certainly doesn't satisfy their burden of clear and convincing evidence. It's a question of an interference, but they're not questioning obviousness. Mr. Brzezinski, he worked in the field for 40 years, and under my cross-examination, he readily admitted that he would never think of such a thing, and it's unimaginable to him. Now, I'm not saying that in itself establishes non-obviousness, but it's their burden of proof. Those are the only two things they came forward with, and they didn't discharge that burden of proof. This is a crossover product that nobody thought was any good or couldn't even conceive of based upon 40 years' experience. So it's their burden of proof, and they didn't discharge it, but I think the patent has to stand. Okay. Thank you, Mr. Brzezinski. We've consumed your rebuttal time, but we will restore it. Could you give our next counsel an additional three minutes? Counsel, I'm having trouble pronouncing your name. I'm sorry for that, Your Honor. May it please the Court, my name is Terry Rader. State your name for the record. Yes, my name is Terry Rader, Your Honor. Now, just for the record, let's make sure everybody knows that we're not in any way related to Arwin again. As far as we know, we're not related to him. Okay. Please proceed. May it please the Court, I will be speaking on behalf of all the attorneys. Let me take up the issue of inequitable conduct, which with respect to inequitable conduct in this case, I think the following are very important things to keep in mind. First, this case, unlike other cases this Court has handled, including the members of the panel, involves a jury determination of inequitable conduct. And if the Court would look at appendix page 97, the jury was instructed specifically that, and correctly and without objection, that the particular burden they were required to look at included looking at the evidence from the defendants to prove that inequitable conduct occurred. Defendants must prove that it is highly probable that the patent applicant or the applicant's attorney or representative intentionally withheld and misrepresented information. So with that background and with that instruction, the facts were that in the Starr Scientific case, as this Court knows, the statement was made in Starr Scientific that credibility determinations are an aspect of fact-finding that appellate courts should rarely reverse. So there was a determination by a jury, after hearing the evidence submitted on inequitable conduct and being instructed correctly, that they had to look for the most probable consequence. And they did. And also, Starr says that if the single most reasonable inference, then the jury's determination should be upheld. In other words, if there was no other possible inference submitted to the jury, then obviously the appellate should not be complaining at this point. The arguments that we've heard here show that the jury did, in fact, hear evidence, a lot of evidence, about the intent or circumstantial evidence relating to the intent to both deceive and withhold information. There was no cross-examination of Mr. Jacobson in front of the jury. So the appellants did not try to create any other reasonable inference at that point. Nor did they present any rebuttal evidence that would have led the jury to believe there's another inference that they could reach. And therefore, the jury only heard evidence. And this was the appellant's obligation to create a different inference if that's what they believe should be in the minds of the jury. When the jury went to verdict, they were faced with all this circumstantial evidence, much of which was very powerful evidence, and it was unrebutted and not cross-examined. Just as an aside, as a trial judge, I've never tried the inequitable conduct of a jury. How did that happen? It happened because the defendant, of course, requested a jury trial. The plaintiffs did not object to a jury trial. In fact, the jury instruction that I read to you from came from the plaintiffs' appellants. They wrote the jury instruction on inequitable conduct. We agreed to it. You'll look at it. It's very clear that it covers intent, materiality, etc., etc. So there was consent. So there was consent. And not only that, Your Honor, but that creates a different issue here that I think the court needs to address. First, you've got the issue of the jury verdict where there was no evidence presented by the appellants that would reach any other inference, as I just said. Then you've got the decision, the findings of fact, by Judge Brown, beginning at page 60 of the appendix, continuing to 62. And these are very, very detailed findings of fact that the judge made in connection with this. Now, that's a second document that this court would have to look at under the abuse of discretion standard, which, Judge Rader, you've written about in connection with the Eli Lilly case where you are looking to see if the findings meet the test of abuse of discretion. None of this is addressed in any of the papers of the appellants. And, in fact, the same arguments that they are making to this court, the identical arguments, were first made to the jury on every issue, on every issue in this case, the same precise arguments were made to the jury first and the jury found against them. Then the same arguments were made to the judge in the Rule 50 motions. The identical arguments with respect to this issue of inequitable conduct, another point that is not even addressed either here today or in their briefs is the issue of the misrepresentations. There was no rebuttal testimony about the fact that when Mr. Jacobson represented to the patent examiner that a garment designer, an expert in designing garments, would not combine Cordova and Clark. There was no basis for that. They didn't even try to explain it away through any kind of creation of good faith or negligence or whatever. It was never addressed. Can we go back to the prior art and take a look at Vera and Clark and some of these? Yes. In particular, Vera is the one that seemed to me to have the strongest case for anticipation, if not opulence. In the case of this discussion, Your Honor, I would argue… It wasn't my commentary, but Mr. Sweeney, you were talking about in Figure 3 or Figure 1, the question was whether the fabric labeled as 3 was the same as whether it encircled the torso. First, in response to your question…  In response to your question, on appendix page 86, is the Markman construction… By the way, which is government? The Markman or the jury, sir? Well, I would say that the judge commented on that on appendix page 31 where he said the court defined the term fabric body as one or more pieces of fabric joined together. That's what the judge said. And he went on to say that Heidi Johnstone had testified that there was no language in the claims requiring the fabric body to be a certain size or precluding the fabric body from being attached to the elastic chest piece. But is it true, as Mr. Sweeney says, that you agreed to the jury instructions that contained the reference to the fabric body? Well, the court's instruction from the Markman ruling says fabric body means one or more pieces of fabric joined together and circling… Did you agree to the jury instruction? We did not object to the jury instructions. Doesn't that become the law of the case, in effect? It becomes the construction of the patent for purposes of the further adjudication of the claims. That might be the case, except for the ruling by the judge in the Rule 50 opinion, which I just read from on page 31 of the appendix. Well, for a second, let's take the jury instruction. Does Vera show fabric in a circling, of course? Yes, I think that the fabric was… And, of course, the testimony that Mr. Sweeney referred to from Mr. Brzezinski is also referred to on page 31 of the appendix. And it says that he did not find a chest band in the Clark… I'm sorry, we were talking about the Vera patent. In connection with Vera, I think, Judge Rader, you pointed out that the figure that is referred to in Clark, or Vera, I believe you referred to, page… I have it on 2040, 2042 of the appendix. All right. Let me read to you from the Vera appendix 2044, column 3, lines 4 to 8. It shows one layer of fabric stitched to form a triangular cup shape and attached to the strap by stitching and extending around the back to form a wide band varying by size. That's the Vera patent. That's shown particularly by figure 3. It shows that the fabric labeled as 3 goes all the way around the back. Correct. And in appendix 2044, which refers to reference 3, it shows fabric panels in two layers in an approximate triangular cup shape, the base of which is stitched in hinged fashion to the bodice band. So clearly it does have that. In the case of, going back to Mr. Jacobson for a moment, I think it's important to realize the timing of these various events. On July 15, 2003, they were provided with the J.C. Penney bra, which is very nice. Pictures of that are shown at appendix pages 2314 and 2315. And it's clear that if you have one of these bras in your possession, you can see on 2314 that there's an outer fabric body. You can see it in the picture. And then all you have to do is to pick it up, and you can tell that there's two layers. There's two layers. It's not like you're looking at a complicated machine. And if you look on page 2315, it's very clear that it included the soft cup frame. Now, the soft cup frame was the thing that was at issue in front of the patent office that was so much concern. The appellants concede that Jacobson and Mr. Rothman both saw the soft cup frame. And so it's impossible for them to say with any credibility, and that's what the jury found, it's impossible for them to say that they couldn't have picked it up and saw quite clearly that there's two layers of fabric that extend all the way around, because that's exactly what this had. So on July 15th, they were provided with that. Less than two weeks later, on July 30th, they return it and say, you know, differing, there's two sides to every story. On July 28th, they were advised by Mr. Dove that this idea had been, had this idea that J.C. Pennybrod was prior art, and therefore, leading lady concluded that there couldn't be any useful patent obtained with the J.C. Pennyrod. They were also told that this idea of the accused product came much earlier than the first meeting with Glameron. Then on August 4th, they were told that the director of design, who was Heidi Johnstone, had actually initiated discussions with Target about the product in August of 2002. And at trial, Ms. Johnstone testified about how she had tried, beginning in 1998, to sell the 460, which is identical to the accused product. She tried to start selling it in 98, she kept trying to sell it. There's testimony that was, and by the way, it's important to realize that Mr. Kirsch is another example of no cross-examination. So now we've got the second person there was no cross-examination of. Mr. Kirsch was the buyer at the Dan Howard organization. So we had four witnesses, independent of Heidi Johnstone,  that they saw this 460 at every step of the way, up to and including the time that it was then accused of infringement. So with this information on August 4th, it's critical to understand that then Mr. Jacobson files a petition to make special. Less than a week later, in fact three days later in the patent office, alleging that the 460 infringed. If the court would look at appendix 74-24, it is clear that Mr. Jacobson says, I have made a careful and thorough search of the prior art. This is after he had summarily sent back the anticipatory JCPenney bra and had been advised that someone else had vented this before GlamourMob. And then he says, I've made a rigid comparison of the leading lady product sample to the claims. And in my opinion, some of the claims are unquestionably infringed. So how could it be any more material? He is saying, wasn't it the case that along with this petition, he sent the Dove letter? But that is not something, as the court knows, is not something that the examiner is going to consider. It's not going to be something the examiner has any way of considering, one way or the other. Does the examiner never see a petition to make special? The petition to make special may be part of the file history, and so ultimately it would. But I don't know whether we can say, and we certainly can't say that the examiner considered the letter in any way that would relate to the examination process. Who rules on the petition to make special, the commissioner or the examiner? Well, Your Honor, I was in the patent office from 1970 to 1977, so I'm not sure who rules on the petitions at the time this was done. But I believe, at least when I was there, it was ruled on in many instances, not by the commissioner, but there would be an assistant commissioner or else. Separate from the commissioner's office, it's separate from the examiner's office. Correct. It's separate from the examiner's court. I think that's true even today. With respect to the issue of this statement by Mr. Jacobson, what I'm trying to point out to this court is that, unlike all the other opinions, and I've got them all here, where this panel has either written opinions or participated on the panel, this case is unique. Very, very unique. Because the jury was correctly instructed under the Starr Scientific case. There was no other inference raised by the appellants in the trial. And critical to this was there was no inference or even explanation raised about Mr. Jacobson's misrepresentations with respect to what a nursing garment designer would do or wouldn't do, which is the other component. In December of 2003, I've given you the facts of July 15, July 28, August 4, August 7, and then we move to December of 2003. In the same year, they were specifically put on notice about this, and I think it's highly important for us to look at the testimony that was given in that regard. When Mr. Jacobson was asked, so you were told in December of 2003 that Leading Lady filed its own patent application after you were told back in August that Heidi Johnstone had conceived the idea before ever knowing anything about Glamour Mom. Isn't that true? It's true. All right, so you had knowledge that there was a pending application in the United States Patent Office by Heidi Johnstone, where the director had signed. You may not have known her name at that time. You had knowledge in December, which is approximately a year and a half or a year and a couple months before your patent came out, correct? I got this letter on this date, yes. And just like he had testified with respect to the JCPenney bra, they did no investigation at all, none. They didn't come back to Leading Lady and say, well, give us some information about the JCPenney bra. Give us some information about the Heidi Johnstone claim that she's a prior inventor. Give us some information so we can see it. They made no investigation. And Judge Brown commented on this in his opinion, where he found, and I think this is, again, worth stating again, to be sure, plaintiff could have avoided a finding of inequitable conduct had it disclosed both the 438 garment as well as its knowledge of defendant's claim to the 460 garment. Do you have any final comments here? Oh, excuse me, Judge Bryson has a question for you. I refer the court to pages 61 and 62 where the judge specifically said, when in doubt, you give it to the patent office. Thank you. I have just one question. I'm going to take you back to the 460 anticipation issue and the question of corroboration. The Orange-Bagging-Against-Juicy-Whip case, among others, suggests that oral corroboration has a fairly dubious standing in challenging the validity of the facts. It looks to me as if there isn't much here but oral corroboration. That's not correct. There are several documents that… I've seen the documents. Those are really thin. I mean, maybe there is some way to view those documents other than any way that I viewed them or anything you put in your brief. But I've read them quite closely, and the documents, I'm setting aside for the moment, figure 13, the patent, which you don't highlight in your brief, but the email, the reference to 460 or some kind of so on and so forth, is pretty thin. Is there anything that you'd like to say by way of distinguishing the Juicy Whip case and that line of cases and saying why that line of cases shouldn't be applicable here? Well, first I'd like to point out the two cases that we cite, the Trovan case and the SANT technology cases, both of which stand for the proposition that oral testimony alone may be sufficient to corroborate prior invention and reduction in practice. So that's one point. But when you have witnesses who either are aligned with or have done extensive business with, in this case, the defendants, then we do look at SCANTS, at oral testimony corroboration. What is it? This case looks very much to me like the Orange Tank case. Why is it not? Well, as I recall, in the Juicy Whip case, there were several people that were somewhat similar to the Wire case. There were several people that were, in essence, interested, plus their recollection was not clear and convincing as what we have here. Here we have testimony by the person who actually sewed the garments together to make the Force 60, Cerny Braddock. She talked about actually putting these together and she talked about having samples, and unfortunately her samples were burned in the fire. But she remembers them because she was so proud of the accomplishment that she'd made. Now, this cloth that one of the buyers didn't even like, what was it like? Well, but that actually is something that is in our favor, Your Honor, because in fact, the fact that she hated it was the fact that it was why she remembered it so clearly. And also, in the Juicy Whip case, Crotella, the only witness to use the dispensers to serve drinks in public, kept the 1983 dispenser for only one month and the 1988 dispenser for less than three months. None of the six witnesses can be said to be disinterested. So, in the case of Cerny Braddock, she was an employee, but Clopton and Kirsch were not interested parties. And they clearly remembered this garment and remembered its construction, and therefore, Your Honor, I think this is far distant from the Juicy Whip case. Thank you, Mr. Braddock. Mr. Sweeney. Yes, Your Honor. Do you have your entire time? Thank you, Your Honor. First of all, on the Bureau Patent, with respect to that figure two, that's the figure that shows a single layer of fabric, not a double layer of fabric. So there's no outer fabric at all in that figure. I'm looking at figure three, I think. Well, figure three, it talks about, I think, I thought you were looking at figure three. I think it's the one that is discussed in column three, it's extending around the back in the form of a wide band. Well, it talks about the two sides of the triangle stitched with trim, the apex of the triangle is a small rectangular piece, Velcro, open-loop fastener material which can be attached, and attached by hand to a corresponding piece of Velcro about the apex of the triangular opening. I see that in looking at figure two, and I think Judge Bryson pointed to that with what you're saying, but figure three, I think, it's not the actual outer layer that's encircling the torso. It's the strap form that's encircling the torso. Secondly, with respect to Mr. Jacobson, yes, I didn't cross-examine him, because he gave a very plausible explanation that he didn't think the reference was material, the JCPenney bra, that he didn't think it formed an outer garment that encircled the torso, and that was his good faith belief. He also testified that he believed it was cumulative to many other nursing bras before the patent office that looked exactly the same. Mr. Brzezinski, the other side's expert, confirmed that he thought it was cumulative. So he gave a plausible explanation. With respect to this argument that he made on combining Cordova and Clark, both of those references was before the examiner. He was advocating, as all patent attorneys do, and there can't be an equitable conflict if the reference is there before the examiner to see, and I don't think there's ever been a case where the failure to go and find an expert can constitute inequitable conduct. Maybe poor judgment, but certainly not inequitable conduct. It's a sign of inexperience. Now, the judge... It is true that the jury found inequitable conduct, but you still have to look at the substantial evidence. You still have to look if there's evidence of intent to deceive, and there really isn't any evidence of intent to deceive. The judge talks about four things. The inexperience, the argument that... This Clark and Cordova argument are the references that were before the examiner. The 2003 provisional application was Johnston and the failure to investigate. None of those things can really be evidence of intent to deceive. Negligence at the most. Now... Any comments on obviousness? If anticipation is close, why not obviousness? Well, I think when you have references, teaching, like patents, you get into this obviousness question. When you have a prop like the J.C. Penney bra, there's no teaching that could be changed in any way. It is what it is. It's a nursing bra, a sports bra, a sports nursing bra. When you come to obviousness, as I said in my opening remarks, it was their burden of proof. They filed a patent application on the same thing. They must have thought it was pretty good after they saw ours and wanted to get a license under it. And Mr. Brzezinski said he couldn't imagine such a thing in 40 years. So where's the proof? Where's the evidence? It's their burden of proof. No one thought of this, and everyone used it. There were jury verdicts of infringement, except for one defendant. So I think there's just a failure of proof on the non-obviousness. And, you know, this is in the net worth of confidence. It's very serious because it will result in an attorney's fee award. It's a very grave harm to my clients. And my clients didn't make the judgment Mr. Jacobs did. He made it in good faith. He gave a reasonable explanation. And there's really... When he says he didn't believe it was material, what else can he do? That was his true belief. He didn't even know there was a second ply there. Maybe he should have studied it more. But that's not the step that he took. D.J. C. Penney. D.J. C. Penney, right. And with respect to the prior invention, I submit, Your Honor, that really is can't-stand-as-prior-argument precedent. Mr. Clopton, Ms. Clopton and Mr. Kirsch, at the beginning of their testimony, they couldn't even remember. They said, I can't remember the details. It's only when they're shown an infringing product that they say, oh, yeah. And they were led. They were led by leading questions because the defendants wanted to go in that direction. Remind me, I read this and now I've forgotten, where in the process does the prosecuting attorney go from having Mr. Dubb, is that the name Dubb? Yes. His letter saying there is this product out there, to having knowledge of the application, the provisional application? The application... Does he ever get a copy of the application? I think it was after getting the Mr. Dubb letter, because the application was after, in other words. And by then it was sort of a, I think, a closed story. In other words, I'm not sure his focus was even on the issue. Mr. Dubb, by the way, said there's a prior invention sometime prior to 2002. Well, Ms. Rothman's invention was 2000. So what Mr. Dubb told him didn't even establish that it was alleged prior art. And so I really don't think you can tag Mr. Jacobson with that. He was in good faith. And even if he was wrong, it's not the deceptive intent. Thank you. Thank you, sweetie. All rise.